# Harrison et al. v. Commonwealth.

(Decided Jan. 15, 1937.)

WILLIAM LEWIS & SON for appellants.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellants and defendants below, Green and Willie Harrison, who are cousins, were indicted by the grand jury of Jackson county, in which they were accused of forcibly robbing Houston Frost by putting him in fear and taking from his person United States money in the aggregate value of between twelve and thirteen dollars. At their joint trial they were each convicted and punished by confinement in the penitentiary for a period of four years. Their motion for a new trial was overruled, and from the verdict and the judgment pronounced thereon they prosecute this appeal, urging two grounds for a reversal: (1) That the court erred in overruling their motion for a continuance; and (2) error in the admission of incompetent evidence offered by the commonwealth. We shall dispose of them in the order named.

1. The indictment was returned on August 27, 1935, and defendants, who were in jail, were brought into court on the same day and the case was set for trial on September 5, following. At the same time an attorney of the Jackson bar was appointed to defend them and he accepted the appointment. On the day set for trial (September 5, 1935) defendants filed their affidavit asking a continuance because of the absence of Jack Standifer, Jack Williams, and Boyd Witt, whom they claimed were material witnesses for them and whom they also said resided in Jackson county, Ky., but they had procured no process for their attendance, and it was developed on that occasion that those three witnesses were members of a Federal CCC camp and were then at Camp Knox, in Hardin county, Ky., where they were undergoing some sort of training. The judge of the court set the trial forward ten days and issued an order for the absent witnesses to appear in McKee, the county seat of Jackson county, which they did on the 9th day of September, six days before the day set for trial. In the meantime, and on September 7, the Commonwealth's Attorney served notice that he would take their depositions, which he did on the 9th of that month. The record shows that defendants were present in person when those depositions were taken, but their employed counsel, whose services they had procured in the meantime, was not present, though it does not ap-

pear whether the appointed counsel was either present or absent at the taking. In their depositions each of those witnesses denied positively and emphatically what defendants stated in their affidavit would be their testimony if present.

Such affidavit statements were: That defendants had won the money from Frost (the person said to have been robbed) in a crap game and that the three alleged absent witnesses would testify that they passed the place by the side of a road where the game was played and saw defendants engaged in a crap game with a third person whom the alleged witnesses did not know, and which was in the early evening but after dark. On the contrary, those witnesses stated in their depositions that they were at the time specified more than a mile from the scene of the alleged game, where the robbery was alleged to have been perpetrated, in attendance upon a church meeting, and that they never knew anything about it, and that all of the statements of defendants in the affidavit for a continuance relating to their evidence were absolutely false. Defendants did not procure a subpœna for those witnesses when they were present in Jackson county, and after giving their depositions they returned to Fort Knox. On the 15th day of September, the day the case was set for trial the second time, the court overruled the motion for a continuance and entered upon the trial with the result indicated. At the trial defendants testified about the alleged crap game, and they introduced two other witnesses who testified to the same facts that they had set out in their affidavit for a continuance that the other three witnesses would testify to if present. So that, the testimony of the absent witnesses was cumulative and did not relate to facts to which no other witness introduced at the trial testified.

It is rare that an accusation in a criminal prosecution is more satisfactorily established, and the defense thereto, under a plea of not guilty, more weakly presented than is true in the instant case. The prosecuting witness testified that he had been sent with a truck by his employer, a Mr. Richardson, from Richmond, Ky., to the vicinity where he was robbed to get a truck load of coal, and that he was given a certain amount of money by Richardson with which to purchase the coal and he named the denominations, a part of which was

forty dimes and one five-dollar bill, with other coins and bills amounting to about $12.60, including three one dollar bills that the victim himself had; that the first coal operation plant to which he applied for the coal (which appears to have been operated by a Mr. Samples) did not have any coal at that time, and when he arrived there the defendants were at the place and they informed him that about a mile farther at another coal mine he could procure the coal. They then got upon his truck and went with him to that place; that after arriving there one of the defendants threw his hands behind him and both of them demanded of him to "Stick 'em up"; one of them went through his pockets and procured all the money that he had, consisting of forty dimes, three one-dollar bills, and one five-dollar bill, with, perhaps, some other smaller change; and they then left the scene.

Prosecuting witness immediately went with his truck to McKee, the county seat of the county, which was some mile or two distant, and informed the officers of the fact of his having been robbed. Three deputy sheriffs, with the prosecuting witness, went to the home of one of the defendants with whom resided the other one. Defendants had also taken from the prosecuting witness a part of a plug of chewing tobacco and which they claimed at the trial that they also won from him in the same crap game after all of his money had been lost, and which he put up against a nickel when the last successful shooting of the craps was made. On examination the officers found the plug of tobacco, which the prosecuting witness identified, in a pocket of the trousers of one of them, and in looking around they saw a match box on the mantel piece which they opened and found therein a five-dollar bill, three one-dollar bills, forty dimes, and some other small change, making the sum of $12.60. Defendants made no explanation at that time as to their possession of the exact amount of money so found by the officers, coinciding so completely with the amount previously described by the prosecuting witness. They were arrested and taken to the county seat, and on the way thereto the three officers testified that defendants admitted having robbed the prosecuting witness, and that they said nothing about any alleged crap game, which seems to have been thought of for the first time after the indictment was

found. One of the defendants, while testifying in his behalf, was asked: "Q. In coming back to town that night with the officers after they had arrested you, did you tell them that you had robbed this man and was sorry that you had? A. I told them that I took it [the property] but I did not tell them how."

In describing the alleged crap game defendants said that they had only 25 cents between them; that one of them made the first shot of the dice and won; and that he continued to win on each shot that he thereafter made until he had won about $3. The other one then concluded, perhaps, that the money was not being won fast enough, and he took over the dice and in the same lucky manner won all of the balance of Frost's money and his tobacco without him ever having the dice in his hand, and which process must necessarily have happened within a comparatively short time because it was proven that Frost from the time he left the mine of Sample until he returned on his way to McKee was only about fifteen minutes, and that it would take him at least five minutes to go to the place where he was robbed from Sample's plant and about the same time to return, which would be ten minutes in going and returning, leaving about five minutes for all of his money to be won in the manner stated by the defendants. It will therefore be seen that their defense is not only hazy, but extremely incredible, and is of the kind that evaporates in the light of experience and observation because of being wholly incapable of withstanding the test by which truth is separated from falsehood.

The two witnesses introduced by defendants to establish their defense testified, if possible, in a more incredible manner than did defendants with reference to the alleged crap game. Their names were John Day and Sherman Day. They said that they left their home to go to a neighbor's house, who resided some distance away, for the purpose of getting some stovepipe; but the route did not lead by the place where the alleged crap game was said to have occurred. Nevertheless they went something like a mile or more out of their way on their stovepipe hunting mission to go by the place where the game (?) was played on another hunt for pine knots, and that they passed along the road and saw defendants playing craps with some one whom they

did not know. No hour was fixed, and the necessity for injecting the hunt for pine knots was not thought about until the Commonwealth's Attorney developed the long detour that would have to be made by those two witnesses in order to pass by the place where the alleged game was played. There are other facts and circumstances brought out upon cross-examination of those witnesses which convinces any fair-minded person that their entire testimony was a fabrication from beginning to end. A more detailed statement of the testimony would serve to strengthen our conclusion concerning it as so expressed, but we deem it unnecessary to pursue the matter farther, and have stated it to the extent we have done only for the purpose of showing that defendants were proven guilty, according to our conclusion, beyond a reasonable doubt—not only by the testimony which we have related, but also by positive identification of the prosecuting witness when he saw them on the trip with the officers to their home—which would have been a superb occasion for defendants to have confronted him and the officers with their crap game story if it had been true.

Turning now to a concrete consideration of ground 1, it will be admitted that there was, perhaps, no authority for the Commonwealth's Attorney to take the deposition of the alleged absent witnesses contained in the affidavit for a continuance; but those depositions were not read or offered to be read upon the trial of the case. They were taken only for the purpose of refuting the statement made in the affidavit to the effect that the alleged absent witnesses saw that which the affiants stated they would testify to. In other words, that testimony was intended to be used only on the trial of the motion for a continuance, and not to be introduced at the trial of the case on its merits, and such was the only effect that the court gave to it, if any.

It is now insisted in support of ground 1, that the court was without authority and committed grave error in giving any effect to those depositions, and as a consequence erred in overruling defendants' motion for a continuance and in not permitting them to read the testimony that they had set out in their affidavit for a continuance as that of the alleged absent witnesses. They cite in support of that contention the case of Williams v. Commonwealth, 234 Ky. 729, 29 S. W. (2d) 11, but

a reading of that opinion will show that the facts were entirely different from those appearing in this one. Notwithstanding the failure of counsel to refer thereto, we have not overlooked the cases cited in note 5 to section 189 of the Criminal Code of Practice, which are: Mount v. Commonwealth, 120 Ky. 398, 86 S. W. 707, 709, 27 Ky. Law Rep. 788; Hughes v. Commonwealth, 80 S. W. 197, 25 Ky. Law Rep. 2153; Wells v. Commonwealth, 13 S. W. 915, 12 Ky. Law Rep. 111; Salisbury v. Commonwealth, 79 Ky. 425, 3 Ky. Law Rep. 211, and McClurg v. Ingleheart, 33 S. W. 80, 81, 17 Ky. Law Rep. 913.

The note to which those cases are cited says: "It is not proper to permit the Commonwealth to read *affidavits* contradictory of the statements made in the affidavit of the accused for a continuance; but the court may make inquiry to ascertain whether facts stated in affidavit are true, and a continuance may be granted to a day in the term." (Our italics.)

None of those cases fit the facts of this one so as to make them precedents for the determination of the question now before us. The nearest one thereto is the Mount Case; but there is this essential difference between its facts and those of this one. In that case defendant filed an affidavit because of the absence of one Bishop whom he claimed was a material witness for him. His affidavit set out certain facts to which the absent witness would testify. The latter had given his testimony on a former trial, and it had been transcribed by the stenographer, and when the motion for continuance was made the Commonwealth's Attorney declined to admit that the witness would testify to all of the statements set out in the affidavit, but then and there agreed that his testimony as given and transcribed at the former trial might be read by defendant at the trial. It appeared that the affidavit contained additional material facts to which the absent witness had not testified because not inquired about in giving his former testimony. This court said that it was the duty of the court in the circumstances to have continued the case, or allowed defendant to read his affidavit, as to such other additional facts, since no other witness in the case could or did testify to them, nor was there any other witness shown to have been able to do so because not

within their knowledge. Neither did the absent witness contradict such additional facts.

The McClurg Case was not a criminal prosecution, but it *was* an action by a widow and her children against the defendant for maliciously and wantonly killing her husband, the father of her children. Defendant asked a continuance because of the absence of witnesses, but the affidavit was indefinite, general in its terms, and was not sufficiently specific to meet the requirements of the law. The court in passing on the question took notice of the fact that the practice required that the opposite side should admit that the absent witness would testify as stated in the affidavit for a continuance, but it did not say that such testimony could not be contradicted, and it cited the case of Halsey v. Commonwealth, 1 Ky. Law Rep. 402, 10 Ky. Op. 862, to the effect that even where the continuance is sought because of the absence of witnesses the court was not compelled to blindly accept the ipse dixit statement of the defendant filing the affidavit, and said, "when the court is convinced that the grounds for a continuance are intended merely to delay, such continuance will be refused, even though such grounds be the absence of material witnesses." Also the court in the McClurg Case referred to the Wells opinion, in which the same question was involved, and in that opinion we said: "That while the continuance should be granted or refused on the affidavit of the person moving same, and that counter affidavits were not admissible where the application rested on the absence of material witnesses, yet that this rule should not be so restricted as to prevent the trial judge, where he has reasonable grounds from all the circumstances to believe that an imposition is being attempted, or a ruse being practiced, from ascertaining whether this belief is well founded." The court in the Wells Case fortified the excerpt with the cases of Musgrove v. Perkins, 9 Cal. 211, 212; Kneebone v. Kneebone, 83 Cal. 645, 647, 23 P. 1031; Hyde v. State, 16 Tex. 445, 67 Am. Dec. 630; and other cases found in that opinion.

In addition to the domestic cases to which reference has been made, the text in 16 C. J. 469, sec. 843, upholds the right of the court, in a criminal prosecution on an application for continuance because of the absence of witnesses, to inform itself as to the truth of

such alleged testimony, and when the court is convinced that the absent witness will testify to no such facts as are contained in the affidavit it has the right, in furtherance of justice and to prevent a miscarriage thereof, to shape its rulings in accordance with a sound discretion controlled by the particular facts of the case, and which we are convinced is a wholesome rule and should be applied in order to prevent trifling with the court by unscrupulous defendants who are shown to be guilty beyond a reasonable doubt and who are seeking a continuance for delay only. Of course, the depositions of the alleged absent witnesses in this case could not be read at the trial of defendants, even if they had read their affidavit, since under the Constitution (section 11) one accused of crime has the right to be confronted with the witnesses testifying against him, and there is no provision whereby the commonwealth may take the depopsition of witnesses in criminal prosecutions. It will be observed that this is not a case where a third party, even the Commonwealth's Attorney, makes an *affidavit* contradicting one filed by defendant for a continuance, nor do we have the mere ex parte affidavit of the alleged absent witness, since the contradiction here made was by a deposition, taken in the usual form and at which taking the defendants were present and the testimony, we repeat, was not considered, except possibly on the hearing of the motion for a continuance.

Moreover, defendants were afforded every opportunity if they had seen proper to have taken the testimony of the absent witnesses, either at Fort Knox or while they were in McKee, or they could have at least had the witnesses subpoenaed while they were at the county seat of the county in which the trial was had. To hold that the rulings of the court complained of in this ground (1) are erroneous would be nothing short of an acknowledgment of the utter inability of courts to enforce the law so long as those charged with crime choose to block their efforts by means no more substantial than those manifested by this record. But they have not yet reached the stage of utter helplessness to protect themselves, and we have been furnished no case directly in point so holding. If, however, the rule was more mandatory and required the court in any state of case to permit the affidavit to be read as to what the absent witnesses would testify, as set out therein, then

it would not apply in this case, since we have held in numerous prior ones that it was not error to refuse a continuance to obtain mere cumulative testimony to that which was given by other witnesses testifying at the trial. We therefore conclude that this ground is without merit.

2. The testimony complained of in ground 2 may be subdivided into (a) that it was error to admit the testimony of the officers concerning what they found in the home occupied by defendants on the occasion of their arrest, and (b) that the confession of appellants violated our Anti-Sweating Statute (Ky. Stats. sec. 1649b-1 et seq.). Concerning subdivision (a) of this ground, we have held in numerous cases that the person of an accused when arrested for a criminal offense may be searched and likewise may premises occupied by him at the time of his arrest. In addition thereto, there was no objection to the search made in this case. Furthermore, defendants stated that they did not "consent" to the search, but they studiously avoided saying that they *objected* to it, and by not objecting to it while it was going on they consented thereto by silence, and when on the stand each of them stated that he did not object at the time the search was made, nor did they object at the time of the trial. Therefore, this subdivision of ground 2 is without merit.

The same may be said as to subdivision (b) of this ground. It is not pretended by either of the defendants that there was any violation of the Anti-Sweating Statute while they were in charge of the officers on the trip from their home to the county seat of the county in which they were arrested. On the contrary, the officers say that while on the trip some questions were asked them, and that they freely and voluntarily told of the robbery as testified to by the prosecuting witness, and that statement is admitted by at least one of the defendants when he stated, as hereinbefore set out, that "I told them [officers] that I took it [money] but I didn't tell them how."

Perceiving no error in any wise prejudicial to the substantial rights of the defendants, the judgment is affirmed.